COMMONWEALTH of Pennsylvania, Appellant

v.

L.P., Appellee.

Superior Court of Pennsylvania.

Argued Feb. 2, 2016.
Filed April 21, 2016.

John R. Canavan, IV, Assistant District Attorney, Harrisburg, for Commonwealth, appellant.

James J. Karl, Harrisburg, for appellee.

BEFORE: PANELLA, STABILE, and FITZGERALD,* JJ.

OPINION BY FITZGERALD, J.:

The Commonwealth appeals from the order entered in the Dauphin County Court of Common Pleas granting the petition for decertification filed by Appellee, L.P. The Commonwealth argues the trial court erred in finding that transferring L.P. to juvenile court would serve the pub-

_____

* Former Justice specially assigned to the Superior Court.

lic interest and that L.P. was amendable to treatment, supervision, or rehabilitation in the juvenile system. We hold the trial court did not abuse its discretion when it considered and weighed the 42 Pa.C.S. § 6355(a)(4)(iii) factors and granted Appellee's petition for decertification. Thus, we affirm.

We summarize the factual and procedural history of this case, as gleaned from the certified record, as follows. On October 13, 2013, Harrisburg police responded to a dispatch of a shooting near a community center where a dance had been held earlier that evening. Police recovered from the scene approximately five shotgun casings and seven nine-millimeter casings. The police determined that there were two shooters involved, and witnesses identified Appellee, who was fifteen at the time, as one of the shooters. Police believed Appellee shot the nine-millimeter while another juvenile, D.H., used the shotgun. Police believed the intended victim of the shooting was a dance patron with whom D.H. had an altercation at the dance. No one was struck by the nine-millimeter bullets, but people were injured by pellets fired from the shotgun. However, bullets from the nine-millimeter struck a parked van.

On October 17, 2013, Appellee was charged with seven counts of criminal attempt-criminal homicide,[1] and one count each of conspiracy to commit criminal homicide,[2] aggravated assault,[3] possession of firearm,[4] firearms not to be carried without a license,[5] possession of firearm by a minor,[6] and recklessly endangering another person ("REAP").[7]

On March 16, 2015, Appellee filed a petition for decertification.[8] The trial court held a hearing on April 22, 2015. Dr. Howard Rosen[9] performed a psychological examination of Appellee and rendered his opinion on Appellee's amenability to treatment. He testified as to how he formulated his conclusion:

Well, I look to a number of factors. I examined whether or not he had adequate treatment in the past and his responsiveness to that treatment, his level of dangerousness, his intellectual and personality characteristics that would relate to recidivism and further criminality, the history of criminality up to the point where he was put into Dauphin County Prison, and certainly his age, intellectual, and psychological maturity were also considered.

N.T. at 6–7. Dr. Rosen concluded Appellee has a mild intellectual disability and attention deficit hyperactivity disorder. Id. at 8–9. He detailed Appellee's history of truancy and opined "the truancy was really driven pretty much by his association with a set of delinquent peers who treated him as a gang." Id. at 13. He explained that previous interventions with Appellee were unsuccessful because "the types of supervision monitoring that was necessary to deal with [Appellee's] level of problem" could not be implemented in his home. Id. at 15. He further opined, re-

---

1. 18 Pa.C.S. § 901(a).

2. 18 Pa.C.S. § 903(c).

3. 18 Pa.C.S. § 2702(a)(1).

4. 18 Pa.C.S. § 6105(a)(1).

5. 18 Pa.C.S. § 6106(a)(1).

6. 18 Pa.C.S. § 6110.1(a).

7. 18 Pa.C.S. § 2705.

8. See 42 Pa.C.S. § 6322.

9. Dr. Rosen testified he holds a Ph.D. in educational psychology and frequently testified in cases involving delinquency. N.T. Decertification Hr'g, 4/22/15, at 4–5.

garding criminality, that Appellee, "as a criminal, ... [is] unlikely to be thoughtful and cunning" and "doesn't have the level of planning and ... deceptiveness." *Id.* at 20.

Appellee's counsel asked specifically about Dr. Rosen's recommendation for treatment:

Q: ... What was your recommendation for [Appellee]?

A: I believe that [Appellee] would be best served by being in multidimensional treatment foster care. That is a program that essentially provides highly-trained or professional parents in a small family home that's supported by two or three mental health professional teams that are accessible to those professional parents 24 hours a day, 7 days a week.

It has a fairly long course of treatment, generally nine to sixteen months, ... and a very successful track record of addressing serious aggressive problems of students his age with his diagnosis.

Q: Dr. Rosen, when you first came up to testify, you said the word *recidivism* a couple of times. And I think it is important to know, in terms of the multidimensional treatment or foster care program, do we see high recidivism rates?

A: Well, generally, no. Multidimensional treatment foster care is in the area of 60 to 80 percent successful over an 18–month period. So there are no future arrests or convictions after 18 months for more than half of the youth who complete.

Locally, the programs—the residential programs—are generally 80 percent or less effective six months out. So the recidivism rate for—by comparison of non-evidence-based residential programs—is very poor.

Q: So it would be your opinion that [Appellee] would not be best served in either a state correctional facility with adults or a county-based program for adults of incarceration?

A: Generally speaking, the recidivism rate for juvenile offenders with serious personal aggression charges if they go into an adult facility, the recidivism rate is roughly 25 percent. ... [T]he same youth who would be treated in juvenile facilities have a recidivism rate of 15 percent. So in terms of public safety long term, the decision I would recommend would be to retain him as a juvenile.

\* \* \*

Q: In the evaluation that you did, you recommended that [Appellee]—part of his treatment or part of the discussion was that he could attend and complete aggression replacement therapy?

A: Yes.

Q: Why did you recommend that?

A: Well, aggression replacement therapy is an evidence-based program that is delivered as part of group therapy. And the advantage to [Appellee] is that it teaches him about his emotional life, how to identify correctly his emotions, how to better regulate his emotions, be less angry, be less impulsive.

And also ... ten of thirty lessons address morality. And I think having him begin to consider more moral development would be a good choice at his age and development level.

Q: And had he received nothing similar to that in the community prior to the evaluation?

A: Not to my knowledge.

*Id.* at 21–26.

On cross-examination, the following exchange between the Commonwealth and Dr. Rosen occurred:

Q: Okay. So in this situation, obviously your finding is that he is amendable to treatment?

A: Correct.

Q: In your estimation. And I know there's no guarantees in life, but [do] you think the community would be safe allowing him to reenter it with the treatment plan that you think would be appropriate?

A: I think the risk to the community overall is lower by treating him as a juvenile and getting him treatment and education than what we'd find if he were incarcerated in the adult system.

*Id.* at 31.

David Botero, co-director and mentor in the "Hope in Handball" youth mentoring program, also testified on Appellee's behalf and described his relationship with Appellee and Appellee's involvement with the program from 2009–2012. *See id.* at 50–70. He testified the program had a positive effect on Appellee, but he eventually stopped attending because "the streets got ahold of him." *Id.* at 63–64. Finally, Appellee presented the testimony of Dauphin County Juvenile Probation Officer Brian Brummett, who testified that Appellee had two contacts with his office prior to the October 2013 shooting. *Id.* at 76. The first contact involved a failure to pay fines and disorderly conduct, and the second involved charges of possession with intent to deliver controlled substances. *Id.* at 76–77. He testified Appellee had not served any time in a juvenile residential facility. *Id.* at 79.

The Commonwealth called as its only witness Detective Jason Paul of the Harrisburg City Police Department. Detective Paul testified that he was the lead detective investigating the shooting. *Id.* at 87. He explained that Appellee was charged with the above crimes on October 17, 2013; however, he was not appre-

hended until February 2014. *Id.* at 95–97. He described the nature of his interview with Appellee, including Appellee's inconsistent accounts and his accusations that Detective Paul was a racist. *Id.* at 97–99.

The Commonwealth asked Detective Paul about "the impact that guns have had on the City of Harrisburg[.]":

A: Yeah. I mean, talking to the people that we talked—we had people from the West Shore just there—kids came there to have a good dance. The lady said she threw this dance to try to keep kids off the street so they wouldn't get into any kind of trouble. Nothing would happen. They searched the kids to make sure no weapons were brought into the dance.

It appears you had a couple of kids that came there looking for trouble.... [I]f there was that big of a problem, I don't agree with fighting, but they could have fought if it were that big a deal. Instead, they decided to bring out the guns and fire into the crowd.

Violence in the city is pretty bad, especially with the younger kids. They seem to want to shoot over anything—instead of talking it out or anything to even it out. When I was younger, we'd get in fistfights and that was the end of it. These kids now want to bring out guns, and they have no regard for who's around.

There's kids everywhere. They shot at people who had nothing to do with nothing, and they're just shooting into the crowd. And they're not good with guns to use guns, so they could have killed anybody. It's amazing nobody got killed out there.

Q: In your experience, does the prevalence of guns ... make potential witnesses less cooperative in terms of assisting with the prosecution?

A: Yeah. Even the victims, nobody wanted to cooperate. We had the kid that testified at [D.H.]'s thing. We basically had to make him. He was swearing at us. Nobody wants nothing to do with this. They're scared. Everyone says, "You can't protect us. We live out here." They know these guys have guns. They have access to guns.

\* \* \*

[D.H.] I believe he was 15 also, and he had access to a shotgun. It's a simple, common shotgun delivered to him. So there's guns everywhere in Harrisburg.

*Id.* at 99–101.

At the conclusion of the hearing, the trial court made the following findings:

I look at the facts [of the] situation as it was laid out, and to me it was a classic example of impulse without any thought whatsoever. There wasn't any attempt on his part to discern what may have occurred inside. No thought to discern what the implications were to pull that weapon out, let alone fire it, and it appears to be fired on a number of occasions. If I understand correctly, somewhere between seven and nine times.

Shots got fired more quickly than the syntaxes [sic] of your brain will allow thoughts to process, but that fits into squarely what Dr. Rosen was alluding to. And that is the absence of maturity. The absence of cognitive ability.

\* \* \*

. . . I find that this fact situation—as horrible as it is to try to pick up the pieces afterwards—looks to be a classic example of immaturity, impulsivity, stupidity, and being with the wrong people.

---

**10.** We note an order transferring a case from the criminal division to the juvenile division is immediately appealable. *Commonwealth v.*

And that's not an excuse. It's simply an explanation.

If you had gone through the juvenile system and put into placement, had the opportunity to get together and failed at that, this wouldn't even be something on the screen. But in this case, you never really had a taste of what the juvenile system had available to you. Dumb enough to cut that band off and run away from what was available to you, and then you went onto the streets, and you see where you are.

Because the juvenile system didn't have an opportunity, and you didn't have a chance to demonstrate whether you could be rehabilitated, young man, this is your one and only chance to do that. I find that it is actually in the interest of society long term to rehabilitate you and bring you back into the realm of a private citizen.

*Id.* at 139–40.

On April 24, 2015, the trial court filed an order granting Appellee's petition, and the Commonwealth filed a timely notice of appeal [10] on May 5, 2015.

On appeal, the Commonwealth raises the following issues:

[I]. Whether the decertification court erred in finding that the transfer to juvenile court will serve the public interest as the evidence introduced during the decertification hearing clearly demonstrated that Appellee's actions had a manifestly negative impact on the specific victims involved, as well as the community at large and Appellee poses a unique threat to the safety of the general public?

[II]. Whether the decertification court erred when it found Appellee was

*Johnson,* 542 Pa. 568, 669 A.2d 315, 323 (1995).

amendable to treatment, supervision, or rehabilitation because [sic] as a juvenile as he has consistently demonstrated a high degree of criminal sophistication? Commonwealth's Brief at 4.

For both issues, the Commonwealth argues the trial court erred in determining that Appellee met his burden at the hearing to warrant a transfer from the criminal division to juvenile court. Specifically, for its first issue, the Commonwealth contends Appellee "demonstrated an increasing level of criminal sophistication" and displayed a disregard for human life. *Id.* at 17. The Commonwealth further argues Appellee's violence has resulted in witnesses not cooperating and created a "climate of fear" that has "an incredibly negative impact on the community." *Id.* at 17–18. The Commonwealth also challenges Dr. Rosen's assessment of Appellee's cognitive abilities as "objectively unreasonable." *Id.* at 18. For its second issue, the Commonwealth reiterates that Appellee has a "high degree of criminal sophistication" and posits Appellee "is a very dangerous person who has shown that he is not amenable to treatment in the juvenile system.[11]" *Id.* at 19–20. For the reasons that follow, we conclude the Commonwealth is not entitled to relief.

■ Our standard of review is well-settled:

Decisions of whether to grant decertification will not be overturned absent a gross abuse of discretion. An abuse of discretion is not merely an error of judgment but involves misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will.

*Commonwealth v. Ruffin,* 10 A.3d 336, 338 (Pa.Super.2010) (citations omitted).

■ "Pursuant to 42 P[a.C.S.] § 6322(a) and § 6355(e), when a juvenile has been charged with a crime listed under paragraph 2(ii) or (iii) of the definition of 'delinquent act' in 42 P[a.C.S.] § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction." *Id.* Criminal attempt to commit murder, where the juvenile was fifteen years or older at the commission of the alleged offense and a deadly weapon was used, is one of the offenses that requires jurisdiction to vest in the criminal division. 42 Pa.C.S. § 6302. However, when jurisdiction vests with the criminal division under Section 6302, the juvenile may seek a transfer to the juvenile system through the process of decertification. *Ruffin,* 10 A.3d at 338. "In determining whether to transfer a case charging murder or any offense excluded from the definition of 'delinquent act' in section 6302, the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest." 42 Pa.C.S. § 6322(a). To assess if a transfer will serve the public interest, the court considers the factors in Section 6355(a)(4)(iii). *Id.*

■ Section 6355(a)(4)(iii) provides as follows.

(iii) ... In determining whether the public interest can be served, the court shall consider the following factors:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

---

11. We note, with disapproval, the Commonwealth's second argument is devoid of any citation to legal authority. *See* Pa.R.A.P. 2119(a). However, we decline to find waiver, as this defect does not impede our ability to conduct meaningful appellate review. *See Commonwealth v. Kane,* 10 A.3d 327, 331 (Pa.Super.2010).

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

  (I) age;

  (II) mental capacity;

  (III) maturity;

  (IV) the degree of criminal sophistication exhibited by the child;

  (V) previous records, if any;

  (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

  (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

  (VIII) probation or institutional reports, if any;

  (IX) any other relevant factors[.]

42 Pa.C.S. § 6355(a)(4)(iii).

Although the Juvenile Act requires that a decertification court consider all of the amenability factors, it is silent as to the weight that should be assessed to each factor. The ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of the decertification court. A decertification court must consider all the facts set forth in § 6355 of the Juvenile Act, but it need not address, *seriatim,* the

applicability and importance of each factor and fact in reaching its final determination.

*Ruffin,* 10 A.3d at 339 (citations omitted). Furthermore, we presume the trial court considered the entire record in making its determination, and it is not required to give a detailed explanation justifying its decision. *Id.*

█ Instantly, at the decertification hearing, Appellee presented the testimony of Dr. Rosen, David Botero, and Probation Officer Brummett. *See* N.T. at 4–85. Dr. Rosen testified at length on Appellee's cognitive functioning, educational history, prior behavioral interventions, and level of criminal sophistication. *See id.* at 6–28. In forming his recommendation, he specifically considered, *inter alia,* Appellee's past treatment, level of dangerousness, intellectual and personality characteristics, age, and maturity level. *Id.* at 6–7. The testimony of David Botero detailed Appellee's experience with a community mentoring program, and Probation Officer Brummett explained the nature and extent of Appellee's prior delinquent history. *See id.* at 50–84. The Commonwealth presented the testimony of Detective Paul, which primarily discussed the impact of the offense on the community and victims, the nature of the offense, and the threat to the public. *See id.* at 99–101.

The record establishes the court heard evidence on each Section 6355(a)(4)(iii) factor before granting the petition to certify. The trial court recognized the "horrible" nature of Appellee's alleged crime, but credited the opinion of Dr. Rosen and determined that Appellee's actions were a "classic example of immaturity, impulsivity, stupidity, and being with the wrong people" and that the public interest would be served by decertifying Appellee for supervision under the juvenile system. *Id.*

at 142. We presume the court considered the whole record when assessing each statutory factor, and we discern no abuse of discretion. *See Ruffin,* 10 A.3d at 338–39. Further, we decline the Commonwealth's invitation to discredit the conclusion of Dr. Rosen. *See Commonwealth v. Devries,* 112 A.3d 663, 667 (Pa.Super.2015) ("[I]t was for the trier of fact to determine the weight of the evidence and the credibility of witnesses." (citation omitted)). Based on the foregoing, we affirm the order granting decertification.

Order affirmed.

STABILE, J. joins the Opinion.

PANELLA, J. files a Dissenting Statement.

## DISSENTING STATEMENT BY PANELLA, J.

I respectfully dissent from my esteemed colleagues in the Majority. When Appellee opened fire in a crowd of his peers, he exhibited a hardness of heart and acted without regard for social consequences. Although Appellee did not personally kill or injure anyone, his co-conspirator's actions resulted in several people sustaining gunshot wound injuries. Luck is all that prevented the deaths of innocent people. Appellee's actions clearly establish that he poses a profound threat to the public.

While on probation for prior crimes, Appellee cut off his electronic monitoring bracelet and was on the run for nine months before being arrested in an undercover drug operation. This fact coupled with the seriousness of the crimes charged in the instant case indicates that Appellee possesses advanced criminal sophistication such that it is unlikely that he can be rehabilitated prior to the expiration of juvenile jurisdiction, which would occur on March 19, 2019, when Appellee turns 21. I agree with the Commonwealth that Appellee "has demonstrated an increasing level of criminal sophistication." Commonwealth's Brief, at 17. In a little over a year, he went from disorderly conduct to heroin deliveries to evading capture to attempted homicides. One worries what is next.

For these reasons, I believe the trial court grossly abused its discretion in concluding that the transfer of Appellee to the juvenile court system best serves the public interest.