J-A03021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TYSEER JAMES GATES | |
| Appellee | No. 240 MDA 2016 |

Appeal from the Order Entered January 14, 2016
In the Court of Common Pleas of Lycoming County
Criminal Division at No: CP-41-CR-0001358-2015

BEFORE:  LAZARUS, STABILE, and DUBOW, JJ.

MEMORANDUM BY STABILE, J.:                **FILED APRIL 12, 2017**

The Commonwealth of Pennsylvania appeals from the January 14, 2016 order of the Court of Common Pleas of Lycoming County ("trial court"), which granted Appellee Tyseer James Gates' ("Gates") petition for decertification.  Upon review, we affirm.

On June 24, 2015, Agent Raymond Kontz III, Williamsport Police Department, charged Gates with various crimes in connection with armed robberies that occurred on June 23, 2015 and June 24, 2015, respectively.  As reproduced verbatim here, the affidavit of probable cause accompanying the complaint provides:

> On 6/23/15 the Williamsport Bureau of Police responded to 1037 High Street Williamsport, PA 17701 at approximately 2:30 am for a report of an armed robbery that had just occurred.  Police responding into area were given the description of black male suspect as wearing a white t-shirt around his face and green sneakers.

Review of the video surveillance system showed that a black male was outside the store starting at approximately 1:30 am and that upon his arrival he was with a white male. The black male, identified as [Gates,] was carrying a white t-shirt in his hand and the white male, identified as Shon Edward Helm, had a camo style mask around his neck. They are seen watching the store for about an hour and then leaving jumping a fence on the south side of the Uni-Mart.

Video shows that Gates re-appears coming through the parking lot on the west side of the store with his head wrapped in the white t-shirt, with the same green sneakers on, carrying a long barreled rifle. Gates steps into the store pointing the rifle at the clerk and demanding the stores money. The clerk tells Gates that he is on video and will comply with his orders to which Gates tells the clerk that he didn't care because he was wearing a mask.

Helm is seen outside in the parking lot pacing and watching out as Gates robs the store. Both flee west on High Street. Later that morning police do recover the t-shirt that was used as a mask in this incident by Gates along with the camo mask being used by Helm with additional clothing as well as the rifle. The rifle did turn out to be an "Air Pump BB-Gun."

Officers [were advised] to be looking for Gates and if they did find him that [Agent Kontz] wish[ed] to speak with [Gates] about this robbery.

On 6/24/2015 at approximately 2:49 am the Williamsport Bureau of Police responded to Nittany Minit Mart 2300 W 4th Street Williamsport, PA 17701 for a report of a robbery that had just occurred by a black male with a black t-shirt wrapped around his face using it as a mask. The suspect was carrying a black revolver at the time of this robbery.

[Police Officer] Hagan was in the area looking for possible suspects when he located Gates in the parking lot of the Dunkin Donuts located at W 4th and Arch Streets. PO Hagan exited his vehicle making contact with Gates and when Gates offered to sit in the police car PO Hagan asked him if he had any weapons on his [person] at this time. As PO Hagan attempted to pat down Gates he smacked at PO Hagan's hands attempting to stop him.

PO Hagan did feel and immediately recognized an item that was in Gates waistband as a handgun and did place Gates into handcuffs retrieving the weapon which was concealed upon his persons. PO Hagan did also discover a sum of money from Gates back pocket which included a $5.00 bill with a smiley face drawn on it which the clerk did describe to police.

Interviews with [a] 13 year old juvenile indicated that Gates and Helm had asked him to assist in the robbery of Nittany Minit Mart Store and he was promised ½ the money that was taken. Through this investigation and interview with both Gates and Helm it was also learned that Gates and Helm planned the robbery of two different stores for the morning, the Nittany Minit Mart and the Dunkin Donut store both located in the Newberry section of the city. These robberies were supposed to happen nearly at the same time to distract and overwhelm police resources as to make it easier to get away with both of the robberies.

Gates did rob the Nittany Minit Mart with his 13 year old juvenile accomplice. Helm, along with his 12 year old accomplice, went to the donut shop carrying a second black revolver style BB-Gun which he concealed on his persons, but decided not to rob the store because there were too many people.

Affidavit of Probable Cause, 6/24/15. Gates waived his preliminary hearing and the charges were held for trial. On September 23, 2015, Gates filed a decertification motion, seeking a transfer to the juvenile court.

On December 21, 2015, the trial court conducted a hearing on the decertification petition, following which it granted Gates' motion to decertify, transferring the case to the juvenile court. In so doing, the trial court found that Gates was amenable to treatment and that to deny him treatment would not serve the public interest because Gates previously was "never afforded an opportunity to be treated through available resources designed

to address juvenile criminal behaviors." Trial Court Opinion, 1/14/16, at 13-14. The Commonwealth timely appealed.[1]

On appeal, the Commonwealth argues only that the trial court grossly abused its discretion in transferring Gates' case to the juvenile court.[2] Specifically, the Commonwealth challenges the trial court's conclusion pertaining to the last decertification factor, *i.e.*, "whether a child is amenable to treatment, supervision or rehabilitation as a juvenile[.]" 42 Pa.C.S.A. § 6355(a)(4)(iii)(G). The Commonwealth points out that the record does not support the trial court's conclusion that Gates is amenable to treatment.[3]

---

[1] In response to the Commonwealth's Pa.R.A.P. 1925(b) statement of errors complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion largely incorporating its opinion granting Gates' decertification motion.

[2] To the extent the Commonwealth argues that Gates failed to carry his burden of proof because he did not proffer expert testimony in support of decertification, such argument is waived because the Commonwealth failed to raise it before the trial court or in its Pa.R.A.P. 1925(b) statement. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); **Commonwealth v. Hanford**, 937 A.2d 1094, 1098 n.3 (Pa. Super. 2007) (noting that "new theories ordinarily cannot be raised for the first time on appeal[.]"); **see also** Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) s]tatement . . . are waived").

[3] The Commonwealth does not challenge the trial court's factual findings. Its argument assails only the trial court's legal conclusion with respect to the final decertification factor of Section 6355(a)(4)(iii) of the Juvenile Act ("Act").

At the outset, we observe that the trial court's interlocutory order transferring Gates' case from the criminal court to the juvenile court is immediately appealable by the Commonwealth. *See In the Interest of McCord*, 664 A.2d 1046, 1048 n.2, 1049 (Pa. Super. 1995) (stating that "a transfer order adverse to the Commonwealth, while not 'a final decision of the whole controversy,' is, in effect, a final decision regarding the propriety of prosecuting the juvenile as an adult[,]" and such an order, therefore, "is an interlocutory order which is immediately appealable.").

With this in mind, we review a trial court's grant of a motion for decertification for a gross abuse of discretion.[4] *See Commonwealth v. L.P.*, 137 A.3d 629, 635 (Pa. Super. 2016) (citation omitted) ("[D]ecisions of whether to grant decertification will not be overturned absent a gross abuse of discretion."). "An abuse of discretion is not merely an error of judgment but involves misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will." *Id.*

> Pursuant to 42 Pa.C.S.A. § 6322(a) [of the Act], when a juvenile has committed a crime, which includes murder, or any of the other offenses listed under paragraph (2)(ii) or (iii) of the definition of "delinquent act" in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction. Likewise, 42 Pa.C.S.A. § 6355(e) explains that charges of

---

[4] The issue of certification between the juvenile and criminal divisions is jurisdictional and, therefore, not waivable. *Commonwealth v. Johnson*, 669 A.2d 315, 320-321 (Pa. 1995).

murder, or any of the other offenses listed under paragraph (2)(ii) or (iii) of the definition of "delinquent act" in 42 Pa.C.S.A. § 6302, requires that the offense be prosecuted in the criminal division. "Robbery," when committed with a deadly weapon, is one of the offenses listed which requires jurisdiction to vest in the criminal division. 42 Pa.C.S.A. § 6302.

When a case goes directly to criminal division, the juvenile has the option of requesting treatment within the juvenile system through a transfer process of "decertification." [***Commonwealth v.***] ***Aziz***, 724 A.2d [371,] 373 [(Pa. Super. 1999)]. In determining whether to transfer such a case from criminal division to juvenile division, "the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest." 42 Pa.C.S.A. § 6322(a). ***See also Aziz***, 724 A.2d at 373.

***Commonwealth. v. Sanders***, 814 A.2d 1248, 1250 (Pa. Super. 2003), *appeal denied*, 827 A.2d 430 (Pa. 2003).

In determining whether the child has established that the transfer will serve the public interest, the trial court must consider the factors set forth in Section 6355(a)(4)(iii) of the Act. ***See*** 42 Pa.C.S.A. § 6322(a). These factors are as follows:

(4) The court finds:

. . . .

(iii) that there are ***reasonable grounds to believe that the public interest is served*** by the transfer of the case for criminal prosecution. In determining whether the public interest can be served, the court shall consider the following factors:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

**(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:**

> **(I) age;**

> **(II) mental capacity;**

> **(III) maturity;**

> **(IV) the degree of criminal sophistication exhibited by the child;**

> **(V) previous records, if any;**

> **(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;**

> **(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;**

> **(VIII) probation or institutional reports, if any;**

> **(IX) any other relevant factors**[.]

42 Pa.C.S.A. § 6355(a)(4)(iii) (emphasis added). As the foregoing illustrates,

> [W]hen a juvenile seeks to have his case transferred from the criminal division to the juvenile division, he must show that he is in need of and amenable to treatment, supervision or rehabilitation in the juvenile system. If the evidence presented fails to establish that the youth would benefit from the special features and programs of the juvenile system and there is no special reason for sparing the youth from adult prosecution, the

petition must be denied and jurisdiction remains with the criminal division.

**Commonwealth v. Brown**, 26 A.3d 485, 492-93 (Pa. Super. 2011) (internal citations and quotation marks omitted).

Although it requires a trial court to consider all of these factors, the Act is silent on the weight assessed to each by the court, as "[t]he ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of the [trial] court." **Id.**; **see Sanders**, 814 A.2d at 1251 ("A decertification court must consider all of the factors set forth in Section 6355 of the Act, but it need not address, *seriatim*, the applicability and importance of each factor and fact in reaching its final determination."). Finally, "we presume the trial court considered the entire record in making its determination, and it is not required to give a detailed explanation justifying its decision." **L.P.**, 137 A.3d at 636 (citation omitted).

In this case, as mentioned earlier, the Commonwealth challenges only the trial court's conclusion with respect to the amenability to treatment factor of Section 6355(a)(4)(iii) of the Act.[5] Based on the uncontradicted evidence of record and our narrow standard of review, we are constrained to agree with the trial court's conclusion to grant Gates' decertification motion.

_____

[5] Here, it is undisputed that Gates was charged with an offense that properly vested jurisdiction in the criminal court. Specifically, he was charged in connection with **armed** robberies. Under Section 6302 of the Act, robbery with a deadly weapon is excluded from the definition of "delinquent act." **See** 42 Pa.C.S.A. § 6302.

The trial court concluded that, with the exception of the final decertification factor, all other factors of Section 6355(a)(4)(iii) favored the Commonwealth. With respect to the final factor pertaining to amenability to treatment or rehabilitation, the trial court concluded that it favored Gates because, to the extent he received services in the past, he "did well." Trial Court Opinion, 1/13/16, at 9. Seemingly in the alternative, the trial court concluded that, even if the final factor did not favor Gates, it certainly did not favor the Commonwealth. The trial court noted that the record reveals that Gates received a dearth of prior interventional care or treatment services tailored to address his behavioral needs. Indeed, as the trial court reasoned:

> On the date the incidents occurred, [Gates] was 16 years old. ([N.T. Hearing, 12/21/15, at 11 ]). The firearms that were utilized in the crimes were both BB guns. ([*Id.*]).

> For four to six months prior to [Gates] committing the offenses, he had been living in the area by himself. He was essentially taking care of himself. His mother was out of state. ([*Id.* at] 12, 17).

> The Lycoming County Juvenile Probation Office ("JPO") first came in contact with [Gates'] case in February of 2013. He was adjudicated delinquent in Virginia and the case was transferred to Pennsylvania. Lycoming County JPO picked up supervision in August of 2013 when [Gates] was 14 years old. ([*Id.* at 22-24]).

> Because the case was transferred through the Interstate Compact and Lycoming County was doing courtesy supervision, Lycoming County "didn't put a whole lot in place." ([*Id.* at] 24). While community service and in-home counseling was apparently requested, there was no evidence that the community service was put in place or that in-home counseling was provided. ([*Id.* at] 25).

In December of 2013, [Gates] was placed in secured detention in Tioga County for an alleged assault. He subsequently made a counseled admission to terroristic threats and simple assault. He was adjudicated delinquent. He was at Tioga County from December 16, 2013 to December 26, 2013.

As a result of his adjudication, he was placed on house arrest from the date he was released to February 27, 2014.

He was released from house arrest. He was required to perform community service. A mental health evaluation was conducted. They gave [Gates] a diagnosis of Conduct Disorder and ADHD. ([*Id.* at] 27, 28).

According to the evaluator, "***there wasn't a need for any counseling because [Gates] essentially had ADHD and a conduct disorder***." ([*Id.* at] 45).

[Gates] was released from supervision on July 7, 2014. In sum, up to this point, [Gates] was not provided with any services whatsoever to address his behaviors or underlying diagnosis. He was sanctioned via community service, in-home detention and a very brief stay at a detention facility.

[Gates] came back on supervision in November of 2014 after being adjudicated on a retail theft charge. He was directed to perform 24 hours of community services, pay court costs and restitution. ([*Id.* at] 29, 30).

From November 12, 2014 until [Gates'] case was closed in February of 2015, [Gates] remained on juvenile probation supervision. During this brief period of time, JPO worked with the family trying to address some of their basic needs such as heating and furniture. JPO also tried to get [Gates] involved in extracurricular sports activities including martial arts. ([*Id.* at] 30).

[Gates'] mother, however, indicated that her illness had gotten worse and that she was moving to Delaware. As a result, JPO "expedited" [Gates'] conditions of probation by giving him some extra community service. ([*Id.* at] 31-32). [Gates] allegedly moved back to Delaware on January 29, 2015 and the case was officially closed on February 18, 2015. ([*Id.*]).

In sum, by the time [Gates] was released from juvenile supervision, the only services provided to him by the JPO were increased community service, intensive contact with his adult probation officer (multiple times a week), and extracurricular activities including track and martial arts. ([*Id.* at] 40, 45).

The JPO admitted, however, that once they were informed that he was returning to Delaware, they "**were not going to put in a whole lot of time, energy and resources**." ([*Id.* at] 49).  Specifically, they were not going to place [Gates] in any external community based services. ([*Id.*]).

**In fact, had [Gates] stayed in the area with his mother, JPO would have started community based treatment including MST, family based counseling and after school services.  Furthermore, they would have considered either Northwestern Human Services or the Abraxas Habitual Offender Programs**. ([*Id.* at] 49, 51).

In fact, there were numerous services and/or placements that could have been utilized to address [Gates'] behaviors.  For example, [Gates] could have been placed at Abraxas, Northwestern or even the Youth Development Center. ([*Id.* at] 33-34).  Those placements are in secure facilities, and include work programs, education, aggression replacement therapy and programs aimed at reducing recidivism. ([*Id.* at] 34-35).  [Gates] was never given an opportunity to engage in any therapy whatsoever.  **He was never given the opportunity to attend a day treatment program or even a victim impact panel**.  ([*Id.* at] 37, 48).

Unfortunately, in this particular case, the circumstances of what was happening in his life with his family essentially dictated what JPO did or did not do.  JPO "just kind of" watched it and there "wasn't a whole lot in place." ([*Id.* at] 48).

Finally, and perhaps most disturbingly, **it appears that both JPO and the Commonwealth are advocating that [Gates] remain in the adult criminal system because neither wishes to spend the time, energy or resources in rehabilitating him**.

Even though JPO would expect [Gates] to have trouble adjusting to a juvenile facility after being housed in the county

- 11 -

prison, this is not something entirely unusual and placement and programming could be lengthened or increased.  ([**Id.** at] 51).

.  .  .  .

In sum, due to [Gates'] family circumstances, [Gates] has been attempting to survive on his own.  Those same circumstances have resulted in him receiving very little services and programs to assist him or rehabilitate him.  ***Although he has been in the juvenile system, up until this point he has not received or even been offered the juvenile programs and services that he needs***.  Due to his family's moves between Virginia, Pennsylvania and Delaware, [Gates] has fallen through the cracks. Apparently, the Commonwealth is willing to throw him away in the adult criminal system where he is more likely to become unemployable and a career criminal.  The Court, however, is not willing to do so.  [Gates] is not a lost cause.  ***He is amenable to treatment and rehabilitation; he simply [has not] been provided the programs and services he needs***.

Trial Court Opinion, 5/27/16, at 3-7 (emphasis added).

To reiterate, we will not set aside a decertification unless an appellant demonstrates that the court committed a gross abuse of discretion.  A gross abuse of discretion is not demonstrated by merely reciting facts of record that would support a result contrary to the court's actual decision.  ***See L.P.***, 137 A.3d at 635.  In this case, as the trial court's analysis, as recited above, indicates, and based upon undisputed evidence of record, Gates' behavior improved when he received some specialized services in the past.  ***See*** Trial Court Opinion, 1/13/16, at 9.  Additionally, the record supports the trial court's alternative conclusion that because Gates has not received sufficient services to meet his behavioral needs, a conclusion cannot be formed on whether he is or is not amenable to treatment or rehabilitation.  Under the

unique circumstances of this case, we are constrained to agree with the trial court's determination that keeping Gates in the adult system would not serve the public interest as contemplated by Section 6355(a)(4)(iii) of the Act. Accordingly, we cannot conclude that the trial court grossly abused its discretion and, consequently, the Commonwealth's argument does not merit relief.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/12/2017</u>