In the Interest of J.B.

**Appeal of: Commonwealth of Pennsylvania.**

Superior Court of Pennsylvania.

Submitted April 10, 2006.
Filed Oct. 3, 2006.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellee.

Maia M. Silvestro, Public Defender, Philadelphia, for appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 The Commonwealth of Pennsylvania appeals the June 15, 2004, Order denying its petition for certification of J.B. to the criminal division as an adult. We have carefully reviewed the record, finding of facts and conclusions of law promulgated by the trial court and for the following reasons we reverse the ruling of the court below and remand this case for certification to the criminal court in conformity with this Opinion.

¶ 2 On January 27, 2004, J.B. was arrested and charged with repeatedly raping his 11–year–old niece, with the ancillary charges of indecent exposure, indecent assault, simple assault and harassment. The charges were later amended to include sexual assault, involuntary deviate sexual intercourse and statutory sexual assault. J.B. was 17 years of age when these

crimes were committed; he was 19 at the time of his arrest, and is now 21 years of age. On April 13, 2004, the Commonwealth filed a notice of request to certify the case from Juvenile Court to Criminal Court, and on May 5th, based on the testimony of the child victim, trial court judge, Earl Trent found a prima facie case of rape, involuntary deviate sexual intercourse and sexual assault.

¶ 3 A certification hearing was held on June 15, 2004, at which time the court entertained testimony by appellee's probation officer, Sonia Ramos, and a social worker from the Defender Association, Ms. Mays.[1] In its brief, the Commonwealth summarized the testimony of Probation Officer Ramos.

> At the certification hearing on June 15, 2004, Probation Officer Sonia Ramos testified that defendant was not amenable to treatment in the juvenile system. Officer Ramos had conducted a full investigation that included reviewing defendant's criminal history, reviewing his school records, interviewing his guardian, and reviewing mental health evaluations (N.T. 6/15/04, 4–5). Referring to the behavioral health evaluation, Officer Ramos noted that defendant had "the tendency to misread social situations and therefore act inappropriately," and that his drawings showed "an aggressive young man who may act sexually in a somewhat sadistic manner" (*id.*, 5). She further noted that defendant had no employment history, had one hundred and twenty-nine unexcused absences from school in a year, and had failed all his subjects (*id.*, 6). He had two previous juvenile adjudications, one for retail theft for which he was placed on a consent decree, and one for possessing with intent to deliv-

er heroin and crack cocaine for which he received a year's probation (*id.*).

Appellant's brief at 5. In response to Judge Trent's concern as to what services the juvenile system had provided to appellee, Officer Ramos explained generally that the juvenile had been on a consent decree for over a year and also had been placed on one year's probation, but she was unable to elaborate at that time as to what specific services had been offered to appellee because she did not have the complete records in front of her. At this, Judge Trent announced, "So we have done nothing." N.T., 6/15/04, at 6–7. Throughout the hearing, despite the Commonwealth's attempt to shift the focus of the court to the requirements of the Juvenile Act, Judge Trent repeatedly responded in a similar fashion—"The juvenile system has not addressed his needs." *Id.* at 7.

¶ 4 The social worker, Ms. Mays, also testified regarding her unsuccessful efforts to have J.B. placed in a juvenile placement facility.

> I have made several referrals. There is an inpatient sex offenders program. One has rejected him due to his age. That's because they deal with a specific group. There was a specific age group. The second one states that they are at their population quota for special needs children.
>
> Thirdly, I had the Pennsylvania Clinical reviewing his report at this time. As far as outpatient services, Alternative Assessment of Treatment has looked over his report; however, they are requesting an evaluation from JJ Peters.

*Id.* at 11. The court then said, "I find him amenable" and concluded with the statement: "If there isn't [a place that can treat

---

**1.** No first name is provided for Ms. Mays.

him], we will have to find one or the state will have to create one." *Id.* We believe the court capriciously ignored the uncontroverted testimony regarding the juvenile system's inability to "treat" the appellee, when it found him amenable to the juvenile system and entered the June 15, 2004, Order denying the Commonwealth's petition to certify J.B. as an adult.

¶ 5 Following a motion for reconsideration filed by the Commonwealth, a second hearing was conducted on August 25, 2004, at which the Commonwealth produced appellee's records and demonstrated that he had indeed received services provided by the Philadelphia Youth Advocacy Program (PYAP). The record indicated that during the term of his probation, appellee had frequent contacts with PYAP, and that his probation officer had attempted unsuccessfully to improve his school attendance record. Also during the term of his probation, appellee had been ordered to perform community service, a requirement with which appellee failed to comply. Evidence received also indicated appellee had received the benefit of services offered through the Bethesda Day Treatment Center. N.T., 8/25/04 at 8–9, 11. After entertaining this additional evidence, perhaps answering the court's concerns regarding what the juvenile system had done for appellee, Judge Trent changed his focus from the previously relied upon failure of the "delinquency" system, to the perceived failure of the "dependency" system. The court queried, "[i]f we were doing all these things, where was DHS?" *Id.* at 14.

¶ 6 In an effort to demonstrate the treatment defendant could receive if he were certified to criminal court, the Commonwealth then attempted to call a witness who would testify about the Young Adult Offender's Program, a program which offered treatment to juvenile offenders in the adult system. That offer of testimony, however, was refused by the court; Judge Trent stated, "I know nothing about the adult side, so don't tell me anything about it." *Id.* at 16; "I'm only interested in delinquent placements." *Id.* at 19; and "I don't need to have a full picture to be clear in my head." *Id.* at 20. The court then denied the Commonwealth's motion for reconsideration and this appeal followed.

■ ¶ 7 The Commonwealth argues the court erred by focusing on the "perceived failure" of the juvenile system, rather than properly focusing on the statutorily required factors as set forth in the Juvenile Act. We agree. By denying certification, the court ignored defendant/appellee's age, prior criminal acts, recommendation of his probation officer, and the likely unavailability of a juvenile facility to house and treat him. Additionally, appellant contends the court abused its discretion by finding appellee had sustained his burden of proving he was amenable to treatment and that retaining his case in juvenile court would serve the public interest.

■ ¶ 8 We agree with the Commonwealth that in failing to consider "the full picture," that is the "failure of the juvenile system" to rehabilitate and/or control J.B. during the period he was under court jurisdiction for previous derelictions, coupled with J.B.'s tested mental, emotional and behavioral inadequacies, as well as the uncontested allegation that the child victim suffered emotional trauma requiring hospitalization specified as post-traumatic stress disorder, the trial court, when it denied certification, ignored the public interest determination required by the Juvenile Act, 42 Pa.C.S.A. § 6355(a)(4)(iii).

(iii) . . . In determining whether the public interest can be served, the court shall consider the following factors:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system;

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or other institutional reports, if any;

(XI) any other relevant factor.

*Id.* As the Commonwealth correctly points out, pursuant to the 1995 amendments to the Juvenile Act, and described in *Commonwealth v. Burley,* 715 A.2d 430, 433 (Pa.Super.1998), the focus of the court when considering a petition for certification has shifted from only the amenability of the juvenile to treatment, supervision or rehabilitation, to include a determination whether, "there are reasonable grounds to

believe that the public interest is served by the transfer of the case for criminal prosecution." *Id.*

The emphasis has been shifted from the rehabilitation of the child and his amenability to the treatment under the juvenile system to the protection of the public and assurance that the period of incarceration and/or supervision is sufficient to deter further violence.

*Burley* at 433. Such a shift has placed the onus on the juvenile to establish his amenability to the juvenile system, rather than on the Commonwealth to prove a lack of amenability.

¶ 9 We believe the Opinion of Judge Trent, which purports to justify amenability to the juvenile system, is sorely lacking in supporting facts and evidence. Actually, the court's statements and Opinion support the inability of the juvenile system to be capable of rehabilitating J.B. In addition, what is lacking in the trial court's decision, and is the center of the Commonwealth's argument against the mandate, is the court's failure to reach and discuss the issue of the public interest determination required by the Juvenile Act; in particular, that there are reasonable grounds to believe the public interest is served by transfer of the case for criminal prosecution.

¶ 10 The Commonwealth logically argues:

Moreover, in assigning the burden of proof, the Juvenile Act *presumes* that the type of conduct engaged in by defendant—sexual assault committed by a repeat offender who is fifteen years or older—constitutes an adult crime which should be tried in adult court. If (as here) a defendant "was 15 years of age or older at the time of the offense and was previously adjudicated delinquent of

a crime that would be considered a felony of [sic] committed by an adult" and (as here) "there is a *prima facie* case that the [defendant] committed a delinquent act which, if committed by an adult, would be classified as rape [or] involuntary deviate sexual intercourse," the burden is on the *defendant* to establish by a preponderance of the evidence that retaining the case in juvenile court serves the public interest and that he is amenable to treatment as a juvenile. 42 Pa.C.S.A. § 6355(g).[1]

Defendant presented no evidence to overcome the presumption that he should be tried in adult court. The Commonwealth's evidence, meanwhile, demonstrated that he was a danger to society and not amenable to treatment in the juvenile system.

---

1. The Act provides:

(g) Burden of proof—The burden of establishing by a preponderance of evidence that the public interest is served by the transfer of the case to criminal court and that a child is not amenable to treatment, supervision or rehabilitation as a juvenile shall rest with the Commonwealth unless the following apply:

(1)(ii) the child was 15 years of age or older at the time of the offense and was previously adjudicated delinquent of a crime that would be considered a felony if committed by an adult; and

(2) there is a prima facie case that the child committed a delinquent act which, if committed by an adult, would be classified as rape, involuntary deviate sexual intercourse, aggravated assault as defined in 18 Pa.C.S. § 2702(a)(1) or (2) (relating to aggravated assault), robbery as defined in 18 Pa.C.S. § 3701(a)(1)(i), (ii) or (iii) (relating to robbery), robbery of motor vehicle, aggravated indecent assault, kidnapping, voluntary manslaughter, an attempt, conspiracy or solicitation to commit any of these crimes or an attempt to commit murder as specified in paragraph (2)(ii) of the definition of "delinquent act" in section 6302.

*If either of the preceding criteria are met, the burden of establishing by a preponderance of the evidence that retaining the case under this chapter serves the public interest and that the child is amenable to treatment, supervision or rehabilitation as a juvenile shall rest with the child.*

42 Pa.C.S.A. § 6355(g) (emphasis added).

Appellant's brief at 12–14. In this case, the trial judge made it apparent, by his on-the-record discussions with the victim, social workers, probation officers and counsel, that the criterion established by the provisions of § 6355 were not fully considered.

¶ 11 In its findings of fact, the trial court states:

*FINDINGS OF FACT*

This Court finds that the overall evidence and/or testimony presented at the amenability hearing was sufficient as a matter of law to support the Court's decision not to certify the juvenile. Based on the testimony, evidence, and record kept in this matter, the court makes the following findings of fact:

I. The court did not abuse its discretion in refusing to certify the Juvenile.

a. Probation Officer Ramos conducted an investigation and rendered an opinion consistent with the court's decision that the Juvenile was amenable to the juvenile system.

b. Case worker Mays testified that Pennsylvania Clinical was willing to provide the Juvenile with services.

II. The Juvenile's history of neglect by the dependency system attributed [sic] to the factors leading to the Juvenile's delinquency.

a. The Juvenile's dependency issues went unaddressed despite the Juvenile's need for treatment, rehabilitation, and supervision.

III ... Based on a reading of the June 15, 2004, amenability hearing transcript, the Commonwealth was given ample opportunity to present all of its evidence on said date.

Trial Court Opinion, Trent, Jr., J., 10/3/05, at 2–3.

¶ 12 The court detailed specific statements made by Probation Officer Ramos which it found to be supportive of, "an opinion and recommendation regarding the amenability of the Juvenile to the juvenile justice system." N.T., 6/15/04, at 4. The trial court quotes at length from the testimony of Officer Ramos, (which was largely at variance with the trial court's findings) and concludes his Opinion with the following:

> The Juvenile did not have an employment history or is involved in any organizations or social activities. [sic] The Juvenile currently resides in the northwest area of the city. The Juvenile's health evaluation that was conducted on February 5, 2004, was taken into account, as well as, the Juvenile's psychological evaluation. In the Behavioral Health Evaluation (BHE), the doctor indicates that the Juvenile is functioning within the mildly retarded limits. The Juvenile is currently reading at the second grade level. His comprehension and judgment are fair, and the Juvenile can basically differentiate between right and wrong. According to the BHE's the Juvenile's understanding of societal functions and operations are below average. The Juvenile has the tendency to misread social situations and, therefore, act inappropriately. Officer Ramos notes that the Juvenile's drawings describe an aggressive young man who may act out sexually in a somewhat sadistic man-

ner. The Juvenile's school report indicates that he was on inactive office roll until he was reinstated on December 19, 2003. The Juvenile was transferred to Germantown · High School effective March 15, 2004. The Juvenile is in the 11th grade, and has a total of 129 unexcused absences, 0 excused absences, 7 days late, 0 suspensions, and his grades consist of 6—F's. The Juvenile does not have an adult criminal history, and has two (2) juvenile arrests. In the Juvenile's first arrest he was charged with retail theft and placed on a consent decree from April 27, 1999 to April 26, 2000. In the second arrest he was charged with possession with intent to distribute a controlled substance, and was placed on probation from October 15, 2001 to June 30, 2002. **Given the Juvenile's 19 years of age and his history Officer Ramos had to weigh and take into account what services were available. Officer Ramos believes that the Juvenile should be placed with the state because he is 19 years old. The Juvenile is past the age of eligibility for private agencies and is not amenable to the juvenile system.** Given the fact that the Juvenile was provided with a consent decree and was successfully discharged, Officer Ramos doesn't see any services. The Juvenile was also on probation and was not placed.

Trial Court Opinion at 4–5 (citations omitted) (emphasis added).

¶ 13 From the above detailed statement by the trial court as to the probation officer's testimony, the court made finding of fact I(a), as set forth above: "Probation Officer Ramos conducted an investigation and rendered an opinion consistent with the court's decision that the Juvenile was amenable to the juvenile system." A fair

reading of Officer Ramos's report and the certified record in its entirety, however, does not justify the court's finding of fact and clearly is not supported by the record.

¶ 14 In finding of fact I(b), the court found Case Worker Mays testified "Pennsylvania Clinical was willing to provide the Juvenile with services." This statement is only partially correct. Mays testified that while she has attempted to have appellee placed within the juvenile system, due to age, she has been unable to find an inpatient sex offenders program that would accept him, and a second facility had rejected him because it had reached its limit for special needs juveniles. She added that Pennsylvania Clinical was still "reviewing his report" and that an outpatient program had "looked over his report" but was requesting an evaluation. May's testimony concerning the possibility of placement within the juvenile system was tenuous at best.

¶ 15 At the hearing conducted following the Commonwealth's motion for reconsideration, the assistant district attorney, Vincent Regan, provided insight to services previously provided to appellee that proved unsuccessful. N.T., 8/25/04. Regan stated defendant's old records had been located and showed that he had, in fact, received services through the Philadelphia Youth Advocacy Program (PYAP). *Id.* at 8–9. Defendant had frequent contacts with a PYAP worker during his probation. *Id.* at 11. Both the PYAP worker and defendant's probation officer had attempted to help defendant improve his school attendance, to no avail. *Id.* Defendant also had been ordered to perform community service, but had not complied. *Id.* at 12. In addition, according to appellant's brief, appellee had received services through the Bethesda Day Treatment

Center. Appellant's brief at 7. Despite the services offered to appellee during his tenure in the juvenile system, no evidence of success was noted. Assistant District Attorney Regan's testimony offered further support for the probability appellee is not amenable to treatment in the juvenile system.

¶ 16 From the record and the reports provided by the court and Commonwealth, we conclude there is a broad array of factual evidence and testimony indicative of J.B. being a non-coping and dysfunctional child and adolescent throughout the years of his involvement with the juvenile system. The inability of that system to bring about positive changes in J.B.'s behavior and function is attributed by the court, unreasonably, to the juvenile system rather than J.B.'s own failure or refusal to benefit from the system's efforts. In a classical "non-sequitur"[2] at finding of fact II in the court's Opinion, the judge writes:

II. The Juvenile's history of neglect by the dependency system attributed [sic] to the factors leading to the Juvenile delinquency.

a) The Juvenile's dependency issues went unaddressed despite the Juvenile's need for treatment, rehabilitation and supervision.

In particular, as indicated by the Commonwealth and detailed in this Opinion, the following considerations stand out in stark contrast to the findings of the trial court favoring amenability to the juvenile system. The trial court was remiss in failing to consider, when weighing whether the public interest would be served by certification, the required factors set forth at § 6355(a)(4)(iii):

(A) the impact of the offense on the victim or victims; [The victim at 11

---

**2.** Black's Law Dictionary (Seventh Edition) defines non-sequitur as follows: "1) An inference or conclusion that does not logically follow from the premises."

years of age was raped/molested assaulted between 10–20 times and was hospitalized for post-traumatic stress syndrome. N.T., 6/15/04, at 7.]

. . .

(C) the threat to the safety of the public or any individual posed by the child; [Social work and probation reports document the appellee's lack of control, potential for sadistic violent behavior and inability to fulfill probation and school minimal requirements.]

. . .

(E) the degree of the child's culpability; [The court found that a prima facie case was made out as to the rape and sexual assault charges.]

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; [The child's probation officer and Defender's Association social worker attempted placement with various treatment alternatives in the juvenile system and age related, without successful results because of his age, the time needed for treatment which met with the adulthood barrier. In general, nonspecific (sexual treatment) juvenile placements for juveniles are inappropriate and typical delinquency program will not accept sexual offenders. As to adult criminal programs, the options for adult offenders, or juveniles certified to adult court are available, *but in this case the trial court refused to permit the Commonwealth from presenting evidence of such options.*]

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age; [At time of arrest and trial, the juvenile was nineteen years old, already beyond the age of generally available juvenile programs. At this time, he is 21 years of age and can reasonably be accommodated in adult programs, which the trial court *would not consider.*]

(II) mental capacity; [J.B. reads at a second grade level, reached 11th grade on a *pass through basis,* is *mildly mentally retarded* and while on probation and in various support programs, did not cooperate in school attendance or program requirements. This indicates that only in a highly structured program, not available to the juvenile system, at his age, will these limitations be overcome.]

(III) maturity; [Appellee's maturity was evaluated by various tests and observations and it is fair to posit he does not function at the level of an adult of 21 years of age.]

(IV) the degree of criminal sophistication exhibited by the child; [This factor is not clearly documented although there is a major concern for potential sadistic sexual behavior and being prone to misread social situations and therefore react inappropriately documented by the tests.]

(V) previous records, if any; [Two previous arrests appear of record, the first for shoplifting, the second for possession with intent to deliver.]

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child; [The previous involvement (record) is stated at 5, above. As detailed throughout the hearing and record, by findings of the court, it would appear that no marked or identifiable success of rehabilitation attempted by the juvenile court is evident. It might be posited that the

involvement by juvenile court following the two arrests and court supervision and the present arrest and court involvement served as a brake on further acting out behavior. However, one of the most intractable and irremediable behavior or criminal patterns to control is that of the sexual offender, particularly when it involves prepubescent children. This could be a ticking time bomb if a concerted rehabilitation program is not implemented for a period of time that is not limited by the age of J.B.]

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction; [This is the most intractable issue in the certification proceeding in that J.B. is already beyond the jurisdictional parameters of juvenile court.]

(VIII) probation or other institutional reports, if any; [Adequate probation reports and mental and behavior evaluations were supplied to the court by probation and the Defender's Office; all of which are referenced in the record and briefs of the parties.]

. . .

42 Pa.C.S. § 6355, **Transfer to criminal proceedings**; *see also* Appellant's brief at 12–13.

¶ 17 A summary statement in appellant's brief illustrates the Commonwealth's frustration in its inability to present, for the trial court's consideration, a treatment program that is available to J.B. as a youthful offender in the adult correctional system.

The Commonwealth attempted to call a witness to testify about the Young Adult Offender's Program, which offered treatment to juvenile offenders in the adult system. Judge Trent refused to hear testimony from the witness, stating, "I know nothing about the adult side, so don't tell me anything about it. I'm only interested in delinquent placements, and I don't need to have a full picture to be clear in my head." The court denied the Commonwealth's motion for reconsideration without hearing further testimony.

Appellant's brief at 8 (citations omitted). The Commonwealth in conclusion succinctly and concisely summarizes the specific reasons why appellee, now over 21 years of age, is not amenable to treatment in the juvenile system and must be certified to the adult criminal court system.

The 1995 amendments to the Juvenile Act make quite clear that the special treatment afforded by the juvenile system is to be reserved for juveniles who can reasonably be expected to benefit from it. Judge Trent, in focusing on perceived past failings of the juvenile system, ignored the consequences of his own decision. To place violent adult criminals like defendant in a facility with younger non-violent juvenile offenders would undermine the rehabilitation of those who could actually benefit from the placement. Notwithstanding his unfortunate personal history, defendant is exactly the sort of juvenile whom the 1995 amendments to the Juvenile Act intended to divert to adult prosecutions. Indeed, the 1995 amendments presume that even a younger version of defendant—a fifteen year old with the same criminal history—will be transferred to the adult system. Repeated violent offenders like defendant have no place in a juvenile system where their presence will contaminate juveniles who have some chance of rehabilitation. Moreover, even if there were any basis to con-

clude that defendant could be rehabilitated in the juvenile system, it is completely unreasonable to conclude that it could be accomplished in the less than eighteen months before defendant reached age twenty-one.

Appellant's brief at 20–21.

¶ 18 Further, according to caseworker Mays, appellee is "acceptable to PA Clinical School, the Pines, and JJPI day treatment. Some of these treatments are 18 months programs, 12 to 18 month programs, which mean from the time that he enters that program—... we are looking at least another year...." N.T. 8/25/04 at 24. (We note that more than two years have passed since these statements were made and appellee is now over 21 years of age.)

¶ 19 Finally, returning to *Commonwealth v. Burley*, 715 A.2d 430 (Pa.Super.1998), upon which the Commonwealth heavily relies, we believe the *Burley* Court clearly laid out the standard of review for making a proper determination of certification of a child over the age of 15 to criminal court. The Court stated:

> In certifying a juvenile for trial as an adult, a court must evaluate numerous factors. *See* 42 Pa.C.S. § 6355, **Transfer to criminal proceedings**. Prior to the November 17, 1995 amendments which were effective March 16, 1996, the court focused on the amenability of the juvenile to treatment, supervision or rehabilitation. In determining the juvenile's amenability, the court among other factors considered the child's age, mental capacity, maturity and previous records if any. Following the amendments, the court's focus changed and in addition to the above factors, the court now evaluates whether "there are reasonable grounds to believe that the public in-

terest is served by the transfer of the case for criminal prosecution." 42 Pa. C.S. § 6355(a)(4)(iii). The emphasis has been shifted from the rehabilitation of the child and his amenability to treatment under the juvenile system to the protection of the public and assurance that the period of incarceration and/or supervision is sufficient to deter further violence. The juvenile's amenability to treatment is now just one of seven factors in determining whether the public interest is served by transferring the case for criminal prosecution.

*Id.* at 433 (footnote omitted).

¶ 20 In *Burley,* which was an appeal from the trial court's Order certifying the juvenile to criminal court, this Court stated, without question, the public interest factors to be considered under the law weighed heavily in favor of certification to criminal court whether the old or new provisions of the transfer section applied. *Id.* at 434.

> In this case, the new mandate of the juvenile court, pursuant to the amendments of 1995, could not be fulfilled by the programs available through juvenile court. The Juvenile Act, section 6301(b)(2), **Purposes**, provides:
>
> > (2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.

*Id.* at 435.

¶ 21 This concept is now the cornerstone of the juvenile justice system in Pennsyl-

vania and is described in the 2005 Annual Report of the Court of Common Pleas of Allegheny County as follows:

> With the publication of the National Center for Juvenile Justice (NCJJ) White Paper on Youth Competencies, Allegheny County has begun efforts to concentrate on developing more intensive programs in implementing the *principles of Balanced and Restorative Justice; community protection, victim awareness and youth competency.*

*Id.* at 25.

¶ 22 After careful review of the record and the Opinion and findings of fact of the trial court, we conclude the court erred and abused its discretion in failing to apply the law as required by the Juvenile Act pursuant to § 6355(a)(4)(iii), and the juvenile failed to carry the burden required under the Act, pursuant to subsection (G), of proving his amenability to the juvenile system.

¶ 23 The mandate for balanced and restorative justice requires equal concern for the public interest with the rehabilitation of the child. This mandate is carried out in great detail by the provisions of § 6355 of the Act. In further legislative concern for juveniles who commit particular serious, violent sexual offenses (pursuant to § 6352, **Disposition of delinquent child**), and who are placed and remain in a facility upon attaining 20 years of age, it is mandated that such a juvenile is subject to assessment by the State Sexual Offenders Assessment Board, pursuant to section 6358, **Assessment of Delinquent Children by the State Sexual Offenders Assessment Board**. Subsection (f) of section 6358 further provides: "If, at the conclusion of the dispositional review hearing required in subsection (e), the court finds there is a prima facie case that the child is in need of involuntary treatment under the provisions of Chapter 64, (Court–Ordered Involuntary Treatment of Certain Sexually Violent Persons) the court shall direct that the county solicitor or a designee file a petition to initiate proceedings under the provisions of that chapter." *Id.*

¶ 24 In summation, the status of this case as it stands at this time is to abandon the child/adult with no resources or help in either the juvenile system or the adult criminal system and, as a consequence, to jeopardize his future and place the public at risk, with the likelihood that violent if not fatal consequences will result. We find it necessary to remand this case to the trial court with directions to certify J.B. to criminal court so as to allow him the opportunity to reap the benefit of the resources and controlled supervision it offers. Time and appellee's age have virtually transcended the opportunities available at the beginning of this proceeding, and to properly serve the public interests and rehabilitate J.B., certification to criminal court is the best, if not only, option remaining.

¶ 25 The Order of the trial court is vacated. We direct that upon remand, the case be certified to the Criminal Division of the Court of Common Pleas of Philadelphia County in conformity with this Opinion.

¶ 26 Jurisdiction relinquished.

¶ 27 FORD ELLIOTT, P.J., concurs in the result.