J-A14003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
JASIR HARRIS : No. 1774 EDA 2024

Appeal from the Order Entered May 22, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010111-2021

BEFORE: PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.: **FILED JULY 22, 2025**

The Commonwealth appeals from the order entered on May 22, 2024, granting Jasir Harris' motion for decertification to the juvenile court division. We have carefully reviewed the record, findings of fact and conclusions of law issued by the trial court, and for the following reasons, we reverse the ruling of the trial court and remand this matter for trial in the adult criminal division.

A previous panel of this Court set forth the relevant factual and procedural history:

On August 25, 2021, [Harris] was arrested and charged with two counts of attempted murder and related charges. On December 16, 2021, a preliminary hearing took place during which the Commonwealth presented the following evidence.

On August 23, 2021, at about 8:00 p.m., Philadelphia police officers [Henry] Glenn and [Aziz] Allen, in uniform but in an

_____

[*] Retired Senior Judge assigned to the Superior Court.

unmarked patrol car, responded to a radio call reporting an armed carjacking of a white Chevrolet Malibu at a Philadelphia Wawa convenience store. [The report provided by the victim referenced a dark colored sedan as assisting the individual who stole the Chevrolet.]

The owners of the carjacked vehicle helped other officers track the car's location using the car's "OnStar" service. Officers Glenn and Allen found the [stolen] car parked in the 2200 block of North Reese Street, about two miles away. There they also saw a dark colored sedan parked directly in front of the Malibu and a black person wearing a white T-shirt—[Harris], the car's driver and only occupant—in the driver's seat. Officer Glenn, who had initially driven past the Malibu and the dark colored sedan, turned around to continue to investigate. At that moment, [Harris] began firing a gun at them.

Officer Glenn sustained a gunshot wound to his head [behind his left ear] from a bullet fragment and injuries from glass shards, and Officer Allen received facial lacerations from flying glass when bullets pierced the vehicle's rear driver's side window. [Harris] fired approximately 16 shots at the officers in their car and then fled, leaving the dark sedan's door open. Despite his injuries, Officer Glenn attempted to pursue [Harris] on foot, while Officer Allen, who had jumped into the driver's seat, attempted to do so by car.

At approximately 8:09 p.m., two other officers, Officers [Matthew] Lally and [Donyule] Williams, were responding to the radio call of a carjacked vehicle being tracked to the 2200 block of Reese Street. They received a report that shots had been fired at police and that a possible perpetrator was a black male wearing a white T-shirt and gray sweatpants. In the 2200 block of North Fairhill Street, one block west of Reese Street, a woman approached Officers Lally and Williams and gestured toward the direction of the 2300 block of North Fairhill Street. When the officers drove to this block, they saw [Harris], wearing a white T-shirt and gray sweatpants, in a group of people standing on the sidewalk. [Harris] seemed out of place because he was younger than the others in the group and appeared to have fresh grass and mud stains on his pants and shoes. The officers approached [Harris] and asked for his name and date of birth. [Harris] provided an accurate last name but a false first name and date of birth. It

appeared to the officers that [Harris] was nervous and breathing very heavily.

Since Officers Glenn and Allen were in the hospital for their injuries and unavailable to attempt an identification, [Harris] was transported to the police department's Homicide Unit while detectives recovered and reviewed surveillance video from nearby businesses and residences. The surveillance video reflected, among other things, the carjacked white Malibu entering the 2200 block of North Reese Street, followed shortly afterward by a dark colored vehicle driven by a black male wearing a gray sweat jacket with a white shirt underneath. Immediately after the unmarked patrol car driven by Officer Glenn entered and then exited the view of the camera, the video showed several individuals running north on Reese Street and then west on Dauphin Street in the aftermath of the shooting (which occurred just out of the camera's view). The last individual—a thin black male with dreadlocks wearing a gray sweat jacket and a white shirt underneath, gray sweatpants, and black sneakers—was carrying a gun.

[Harris'] appearance and clothing (except for the sweat jacket) closely matched the person seen in the video carrying a gun. Accordingly, police secured [Harris'] clothing as evidence. Near the scene of the shooting, homicide detectives found a discarded gray Nike sweat jacket identical to the one worn by the person carrying the gun on the surveillance video and matching the pants [Harris] was wearing. One of the discarded sweat jacket's pockets contained keys to the dark colored sedan, a dark blue Nissan that had been stolen in Philadelphia the previous day.

At the conclusion of the preliminary hearing, all charges against [Harris] were held for court except for a theft charge.

At the time of the alleged offenses, [Harris] was sixteen years old and eight months and had a lengthy record of delinquency.[a]

> [a] In February of 2020, [Harris] was arrested and charged with robbery and related offenses… . In April 2020, a bench warrant was issued after he allowed his court-ordered GPS monitor's battery to run down. The following month, he was arrested for new offenses and charged with violations of the Uniform Firearms Act. In July 2020, he tendered admissions to theft and simple assault in connection with the robbery case and

to possession of firearms by a minor in the firearms case and was adjudicated delinquent. He was in custody from November 2020 to June 2021, when he was released on probation. He soon began violating the conditions of his probation, resulting in the issuance of another bench warrant, which was in effect at the time of his arrest for the shooting at issue here. In October 2020, he was arrested for new violations of the Uniform Firearms Act, to which he tendered admissions and was adjudicated delinquent in February 2023.

On January 26, 2022, [Harris] filed a motion to decertify the case and transfer it to Juvenile Court. He argued that he could not be tried as an adult because, at the time of the alleged offenses, he was only sixteen years and eight months old.

On November 22, 2022, the court held an evidentiary hearing and took the case under advisement. On December 1, 2022, without announcing a decision, the court issued an order granting [Harris'] motion for decertification and transferring his case to Juvenile Court. The two-sentence order did not include findings of fact or conclusions of law. It simply stated that "having heard testimony and oral arguments and having reviewed the exhibits provided by both the Commonwealth and the defense," the court found that "[Harris] is amendable to treatment, supervision and rehabilitation as can be provided by the Juvenile Court." Order, 12/1/2022.

*Commonwealth v. Harris*, 314 A.3d 914, 916-18 (Pa. Super. 2024) (internal brackets omitted) (hereinafter "*Harris I*").

This Court vacated the trial court's order, as it failed in its decision to consider all required factors under 42 Pa.C.S.A. § 6355(a)(4)(iii) and remanded to the trial court "to consider **all** factors . . . in the course of determining whether to grant [Harris'] motion for decertification." *Id.* at 922 (emphasis in original). Upon remand, the trial court held a hearing to issue its findings of fact and conclusions of law on May 22, 2024. At that hearing, the

- 4 -

Commonwealth requested permission to present additional evidence, specifically, evidence of new charges against Harris regarding a cell phone found in his cell that included disparaging remarks against police, a significant social media presence, photographs of Harris making alleged gang signs, and evidence that Harris, while the appeal was pending, exhausted available remedies in the juvenile system.

During this hearing, the trial court noted its confusion regarding whether this Court retained jurisdiction. The trial court believed that the Superior Court directed it to simply issue an opinion clarifying its reasons for granting Harris' motion for decertification while the Superior Court retained jurisdiction. *See* N.T. Hearing, 5/22/2024, at 22 ("the last information I've been advised of is, that the Superior Court remanded it for further action by this [c]ourt, and retained jurisdiction.").

The Commonwealth corrected the trial court in that the Superior Court had relinquished jurisdiction, and requested a new order be issued so that the Commonwealth may appeal. The Commonwealth further questioned the court regarding whether it would accept a motion for reconsideration so that the Commonwealth could present the additional evidence it had proffered. The court noted it would consider it and scheduled a hearing for June 20, 2024. However, on May 22, 2024, the trial court issued a new order granting Harris' motion: "having reviewed the Decertification Motion and related mitigation materials as well as documents in opposition submitted by the

Commonwealth, and having heard testimony and oral arguments by both the Commonwealth and the defense, and finding that this defendant is amenable to treatment, supervision and rehabilitation as can be provided by the Juvenile Court, [the trial court] hereby GRANTS the Decertification Motion." Order, 5/22/24 (single page).

Prior to the next hearing, the Commonwealth filed a motion for reconsideration including multiple exhibits that were unavailable prior to the first decertification hearing. At the hearing on June 20, 2024, the Commonwealth sought to introduce the medical records for Officer Glenn to aid the court in its consideration because Harris seemed to argue his belief that Officer Glenn was not shot in the head.[1] The Commonwealth again sought to introduce evidence of Harris' conduct after the decertification hearing in 2022. The court denied both requests. The Commonwealth filed a timely appeal and complied with the court's order to file a Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b).

_____

[1] Harris' contention was contained in his responsive motion to the Commonwealth's motion for reconsideration. During the discussion on June 20, 2024, the Commonwealth noted it had additional medical records from a second, unrelated shooting Officer Glenn had suffered. The court, believing Officer Glenn was still on desk duty, as he testified to in 2022, asked if Officer Glenn had shot himself. **See** N.T. Hearing, 6/20/2024, at 7-8. The court immediately took the comment back and sought clarification regarding whether Officer Glenn was still working a desk job. **See id.** We understand the court's frustration over this case but remind the court that these types of comments indicate a bias against the Commonwealth. As the Commonwealth does not argue the trial court was biased, we will not address this any further.

The Commonwealth raises the following questions for our review:

Following this Court's decision and order vacating the lower court's first errant decertification order and remanding with directions, did the lower court err in perfunctorily repeating its grant of defendant's motion for decertification and transferring this case, involving multiple counts of attempted murder of police officers and related offenses, to juvenile court, when:

(a) the lower court on remand merely prepared a new *opinion* purporting to explain in greater detail its prior decertification order—which this Court vacated—rather than reassess *whether* to decertify this case as directed by this Court;

(b) the lower court abused its discretion in concluding, even on the existing record, that defendant sustained his burden to demonstrate that decertification will serve the public interest; and

(c) the lower court also erred in declining to entertain new evidence proffered by the Commonwealth in its motion for reconsideration that had necessarily been unavailable at the time of the 2022 decertification hearing?

Appellant's Brief, at 4 (emphasis in original).

Because we find the trial court erred in granting decertification, we decline to address the Commonwealth's first and third issues. Although we find that the trial court erred based upon the existing record, we are troubled by the trial court's refusal to hear the obviously relevant evidence proffered by the Commonwealth following our remand order. At times in this memorandum, we refer to the proffered evidence because the trial court was made aware of it at the hearings held on May 22, 2024 and June 20, 2024. However, our decision to reverse is based on our finding that the trial court committed an abuse of discretion based upon the record before it.

- 7 -

We therefore begin with the Commonwealth's second issue, whether the trial court abused its discretion in granting Harris' motion for decertification. As this Court explained in **Harris I**:

> An order transferring a case from the trial division of the Court of Common Pleas to that court's juvenile division is immediately appealable by the Commonwealth as of right. Accordingly, we have jurisdiction over this interlocutory appeal. We review orders granting decertification and transferring a case from adult criminal court to Juvenile Court for [a] gross abuse of discretion.

**Harris**, 314 A.3d at 918 (citations omitted).

"An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will." **Commonwealth v. Sanders**, 814 A.2d 1248, 1250 (Pa. Super. 2003) (citation omitted). Further, the trial court's factual findings must be supported by the record. **See In re J.B.**, 909 A.2d 393, 399 (Pa. Super. 2006) (reversing order granting decertification because the record did not support the trial court's findings of fact).

**Harris I** described the process of charging a juvenile in adult criminal court and how a juvenile may request the case be moved to juvenile court:

> The Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375, defines a "delinquent act" in relevant part as follows:
>
> > (1) The term means an act designated a crime under the law of this Commonwealth …
> >
> > (2) **The term shall not include**:
> >
> > > (i) The crime of murder.

- 8 -

(ii) Any of the following prohibited conduct where the child was 15 years of age or older at the time of the alleged conduct and a deadly weapon as defined in 18 Pa.C.S. § 2301 (relating to definitions) was used during the commission of the offense which, if committed by an adult, would be classified as:

> (I) **An attempt**, conspiracy or solicitation **to commit murder** or any of these crimes as provided in 18 Pa.C.S. §§ 901 (relating to attempt), 902 (relating to criminal solicitation) and 903 (relating to criminal conspiracy).

42 Pa.C.S.A. § 6302 (definition section; emphasis added).

"Pursuant to 42 Pa.C.S.A. § 6332(a) and § 6355(e), when a juvenile has been charged with a crime listed under paragraph 2(ii) … of the definition of 'delinquent act' in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction." ***Commonwealth v. L.P.***, 137 A.3d 629, 635 (Pa. Super. 2016). Criminal attempt to commit murder, where the juvenile was fifteen years or older at the commission of the alleged offense and a deadly weapon was used, is one of the offenses that requires jurisdiction to vest in the criminal division. 42 Pa.C.S.A. § 6302.

When jurisdiction vests with the criminal division, however, the juvenile may seek a transfer to the juvenile system through the process of decertification. "In determining whether to transfer a case charging murder or any offense excluded from the definition of 'delinquent act' in section 6302 the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest." 42 Pa.C.S.A. § 6322(a). To assess if a transfer will serve the public interest, the court considers the factors enumerated in 42 Pa.C.S.A. § 6355(a)(4)(iii).

Section 6355(a)(4)(iii) prescribes that when determining whether transfer will serve the public interest, the court must consider **all** of the following criteria:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors ….

42 Pa.C.S.A. § 6355(a)(4)(iii).

When the trial court finds that a juvenile has met his burden to show that the public interest will be served by transferring the case to the "division … assigned to conduct juvenile hearings," the court must "make findings of fact, including specific references to the evidence, and conclusions of law in support of the transfer order." 42 Pa.C.S.A. § 6322(a), (b); Pa.R.Crim.P. 597(C) ("At the conclusion of the hearing, but in no case longer than 20 days after the conclusion of the hearing, the judge shall announce the decision in open court. The judge shall enter an order granting or denying the motion for transfer and set forth in writing or orally on the record the findings of fact and conclusions of law").

"If the court does not make its findings within 20 days of the hearing … the defendant's petition to transfer the case shall be denied by operation of law." 42 Pa.C.S.A. § 6322(b). This statutory requirement of a prompt order with specific findings of fact and conclusions of law respects the presumption embodied in the Juvenile Act that certain serious offenses, even when committed by youthful offenders, belong in criminal court. *See* 42 Pa.C.S.A. § 6302(2) (defining "delinquent act" and enumerating crimes not included by the term). It also facilitates appellate review of orders granting decertification of criminal cases that the Commonwealth may pursue as of right. [*See Commonwealth v.*] *Johnson*, 669 A.2d [315,] 322-23 [(Pa. Super. 1995)].

*Harris I*, 314 A.3d at 919-20 (brackets omitted, emphasis in original).

In 1995, our legislature chose to remove the focus of the Juvenile Act from rehabilitation and treatment of juveniles to "the protection of the public interest" by "provid[ing] balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community." 42 Pa.C.S.A. § 6301(b)(2). The

legislature chose to amend the Juvenile Act due to "[t]he dramatic increase in violent crimes committed by juveniles in our society[.]" ***Commonwealth v. Cotto***, 708 A.2d 806, 809 (Pa. Super. 1998). This Court in ***Cotto*** referred to the comments of our legislature during the passage of the amended Juvenile Act:

> [The amended Act] basically says that if you commit adult crime, you are going to do adult time.
>
> One of the criticisms of the current juvenile justice system is the fact that many juveniles are back in the community before the victim heals from the injuries they have suffered and under this bill that is going to change. Under this bill, if a person 15 years of age or older commits that adult crime, they are going to be tried and they are going to be sentenced, whether it be a sentence of 5 to 10 years, or perhaps even more, to serve time that is not only going to be rehabilitative but that is going to be the appropriate punishment for the crime that has been committed … Juveniles who are violent offenders, who have proven they have not been amenable to treatment under the juvenile system, will, therefore, be handled by adult court.

***Id.*** at 812 (brackets and citation omitted).

In considering whether the transfer to juvenile court would serve the public interest it is paramount to remember that "[t]he emphasis has been shifted from the rehabilitation of the child and his amenability to the treatment under the juvenile system to the protection of the public and assurance that the period of incarceration and/or supervision is sufficient to deter further violence." ***In re J.B.***, 909 A.2d at 396 (citation omitted).

With this background in mind, we turn to the trial court's decision. Upon a thorough review of the certified record, we find the trial court's factual

findings are not supported by the record. Harris did not carry his burden of proof that the public interests would be served by granting his decertification. We therefore reverse the order granting decertification. We address each factor in turn.

On May 22, 2024, the trial court issued its findings of fact and conclusions of law addressing the required factors under section 6355(a)(4)(iii). Regarding the impact of the offense on the victims, here Officers Glenn and Allen, the trial court noted:

> Two Philadelphia police officers were injured in this shooting. Both officers, Officer Henry Glenn and Aziz Allen, testified that at approximately 8 PM on August 23, 2021, they were in uniform and were traveling in an unmarked police vehicle when they were fired upon by the defendant. Officer Glenn testified that he suffered a gunshot wound to the head. He was taken to Temple Hospital for treatment. He was not admitted, and no surgery was performed. He reported feeling anxious following this shooting and was transferred from a street job to a desk job in a police investigative unit. He reported that his girlfriend who was also on the police force but who was not present at the shooting, was so upset that she took extended time off from work because of her anxiety. Officer Glenn reported that both his father, a homicide detective, and his mother were very upset by this shooting. No medical reports were submitted by the Commonwealth.
>
> Officer Allen reported that he was in the same vehicle with Officer Glenn at the time of the shooting. He reported that he has a wife and 3 children. He was not shot, however, glass from his vehicle shattered as a result of the gunfire and fragments of glass became embedded in his head, eyes and face. Officer Allen testified that he went to the hospital and had most of the glass removed, and he was released with pain medication. He testified that glass remained imbedded in his head for a couple of days after the shooting. He reported that his wife and children were all anxious as a result of the shooting, to the point that his children say that they "don't want their daddy to die." Officer Allen testified that he did not receive a new work assignment, but he does have a new

- 13 -

> partner. He also testified that he still has anxiety when he is near the area where the shooting took place, and he no longer likes being in unmarked police cars. No medical reports were submitted by the Commonwealth.

Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 1-2 (record citations omitted).

The trial court oddly placed significant emphasis on the fact that the Commonwealth did not submit medical records for either officer, yet declined to allow the Commonwealth to supplement the record with Officer Glenn's medical records. These medical records would have shown that Officer Glenn did later have surgery to remove the bullet from his head. *See* N.T. Hearing, 6/20/24, at 6-10.

Even if we were to ignore the new evidence of the bullet being removed from Officer Glenn's head, we would find the trial court woefully undervalued the significant impact on the victims as a result of this shooting. Officer Glenn testified he suffered physically and emotionally as a result of this shooting, and so did his girlfriend and parents. *See* N.T. Hearing, 11/22/22, at 17. His girlfriend, also a police officer, heard the radio call that he was shot. *See id.* at 17-18. "She had to go to the scene and see my police car shot up and bloodied. She then had to go to the hospital and see her boyfriend suffering from a gunshot wound." *Id.* at 18. When Officer Glenn returned to work, his girlfriend "broke down and had to take extended time off, because she was constantly in a[n] anxious and worrying state that I was going to get hurt again or even killed." *Id.*

- 14 -

Notably, Officer Glenn was in the East Violence Reduction Unit that "target[ed] gun violence in the areas that are impacted most, North Philadelphia, Kensington area and areas that struggle with gun violence." *Id.* at 19. Due to his anxiety, Officer Glenn was removed from this unit and transferred to a desk job. *See id.* at 20. This move resulted in a trained police officer being removed from a needed position that assisted some of our most vulnerable populations dealing with excessive gun violence.

Instead of focusing on the actual impact on the victims, the trial court erred in focusing on the fact that the Commonwealth did not submit medical records to substantiate the officers' testimony. We will credit the trial court's Rule 1925(a) opinion that found "[i]t is undisputed that the victims in the instant case, Officer Glenn and Officer [Allen], as well as their loved ones, were greatly impacted by this shooting. … [B]oth officers testified to the trauma and anxiety that they and their loved ones experienced both on the day of the shooting and after the shooting." Trial Court Opinion, 8/15/24, at 15.

Turning to the second factor, the trial court stated: "No information was provided to the court regarding the impact of this shooting on the community at large. However, the court will take judicial notice that firing guns on a public street is a concern for the community at large." Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 2. This evaluation gives short shrift to this factor. Firing a gun 16 times at police sows fear in the community of more

senseless gun violence and risks the lives of those living, walking, or driving in the area. Furthermore, the shooting occurred after Harris assisted another in stealing a car at gunpoint. As the Commonwealth aptly noted: "it involved the deliberate use of a gun with the specific intent to kill two police officers in the course of their investigation of a reported violent crime." Appellant's Brief, at 35. This factor clearly weighs in favor of denying Harris' motion to decertify his case to juvenile court.

In assessing the threat to the safety of others posed by Harris, the trial court noted, in full:

> In argument following the testimony, the Commonwealth outlined the prior contacts which this defendant had with the criminal justice system, including open juvenile cases for charges of possessing a firearm for which he has no license due to his age, theft by unlawful taking, and strangulation. He had been in a juvenile placement for 6 months and was eventually released with GPS monitoring, which was eventually removed by the juvenile court. The Commonwealth representative also reported that the defendant had a number of failures to appeal related to the various reported offenses.
>
> The Commonwealth marked and moved into evidence a document packet identified as Exhibit C-1. The document packet contains, among other things, body-worn camera footage of the aftermath of the shooting and videos of the defendant brandishing several handguns.

Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 2-3.

The trial court did not even consider the facts of the current charges in assessing the threat to the safety of others posed by Harris. Harris not only fired 16 times at police officers after assisting another individual in an armed carjacking, but he has multiple other charges for firearm possession by a

juvenile. Initially, Harris was charged with robbery that was resolved with an admission to theft and simple assault. While the robbery charges were pending, Harris allowed his GPS monitor's battery to run low, and the court issued a bench warrant for this violation. Further, after he was released on probation, Harris almost immediately began violating his probation, resulting in another bench warrant. Finally, and most importantly, Harris had an outstanding bench warrant for firearms violations at the time of this shooting. The trial court critically failed to adequately consider the whole record in evaluating Harris' threat to other's safety. This factor weighs heavily in favor of denying Harris' motion for decertification.

The trial court next considered the nature and circumstances of the offense:

> In this case, it is alleged that at approximately 8 PM on the evening of August 23, 2021, the defendant fired a weapon 16 times at two police officers who were in uniform and in an unmarked police vehicle. The defendant fled the scene after firing his gun. One officer was struck and the other officer suffered cuts from shattered glass fragments …. Body-worn camera footage from one of the officers, submitted as part of Commonwealth's Exhibit C-1, shows the back driver's side of the police vehicle shattered from the gunshots. Both officers received medical treatment at a local hospital and were released.

Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 3.

While the trial court's terse findings are tangibly correct and supported by the record, the trial court ignores the fact that Harris had just assisted another individual in an armed carjacking and while fleeing from police, was able to discard the firearm and his jacket in an attempt to conceal his

involvement with these crimes. Further, when approached by officers who quickly responded to the scene and located Harris a short distance away, Harris provided a fake first name and date of birth. Harris' actions clearly show his intent to kill two police officers simply to cover up an armed robbery and his intent to conceal his identity in the shooting.

Next, the trial court evaluated the degree of Harris' culpability: "This child is the only person alleged to have committed these offenses." Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 3. The record unequivocally shows that Harris was the only individual charged with attempting to kill two uniformed officers. Harris' degree of culpability is extremely high.

Continuing, the trial court weighed the adequacy and duration of dispositional alternatives in either the juvenile division or adult system:

> If the defendant were returned to the Juvenile Justice System and either entered an admission or was adjudicated delinquent, until age 21, he would be eligible for supervision and therapeutic services designed to address the remediation and treatment needs which were identified in the Forensic Evaluation prepared by Dr. Constance Mesiarik, PhD, JD, on August 10, 2022. This document was submitted to the court and was marked as Defense Exhibit D-1. Dr. Mesiarik diagnosed the defendant with Post-Traumatic Stress Disorder (PTSD), Conduct Disorder, and Cannabis Use Disorder. She also identified the following 5 areas of treatment needs which, she opined at pages 8-10, may reduce the risk of future criminal behavior by the child. The identified areas were educational remediation and vocational training, anger management and skill-based training, structured pro-social activities, substance abuse rehabilitation and education, and finally, mental health counseling. Defense counsel, in argument, submitted the proposition that all of these services would be available in state juvenile detention.

- 18 -

> If the defendant were tried as an adult and convicted of the lead charges in this matter, he would likely face a substantial amount of time in an adult prison without the benefit of the remedial services which have been identified. It is not possible for this court to determine what the likely sentence would be as that would be dictated by the charges of which he may be found guilty and by the sentencing judge.

Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 3-4.

Considerably absent from this analysis is whether the recommended services are actually available to Harris if he were to be transferred to the juvenile division. The trial court merely assumes from defense counsel's argument that the services are available. Further, this analysis ignores the fact that Harris was in the Riverside Correctional Facility pending the outcome of this motion and while there he received two infractions, one major and one minor. The major infraction involved assault and the minor infraction involved fighting with no injury. ***See*** Exhibit D-1, Letter from the Philadelphia Department of Prisons (undated, single page).

This evaluation further ignores the Commonwealth's new evidence proffered at the hearing held on May 22, 2024. Specifically, the Commonwealth attempted to show that while the appeal was pending, Harris had a prohibited cell phone while in custody. ***See*** N.T. Hearing, 5/22/24, at 7. A search of this cell phone showed multiple online posts of this Court's opinion in ***Harris I***, with comments such as "I spanked [their] ass again," "I['ll] be home real soon," and a middle finger emoji followed by a police officer emoji. ***See*** Motion to Reconsider, 5/31/24, at Exhibit B, C. Further, the

Commonwealth was prepared to present evidence that photographs of Harris found on the cell phone included Harris displaying gang insignia. *See id.* at Exhibit E, J; Appellant's Brief, at 44. Finally, the Commonwealth was prepared to present evidence that Harris had exhausted the remedies available to him in the juvenile division while the appeal was pending, but the trial court refused to consider any of this new evidence. *See* Appellant's Brief, at 38.

Notably, the trial court did not even consider the length of time left before Harris turns 21 in December of 2025 and juvenile jurisdiction terminates. At the time of the trial court's second order granting decertification, about 18 months were left before Harris turns 21 years old. The trial court's factual findings, as to the availability of ample time to work on rehabilitation for Harris, are simply not supported by the record.

The trial court did consider the time left in its evaluation of the next factor, whether the child is amenable to treatment, supervision, or rehabilitation. In this analysis, the trial court considered a number of "other relevant factors" but did not fully discuss the enumerated factors. We begin with an evaluation of the factual basis for the trial court's finding that Harris is amenable to treatment, supervision, and rehabilitation, for which we find no support in the record.

Even if the services recommended would be available to Harris in the juvenile division and could be successfully completed within 18 months, we would have to ignore Dr. Mesiarik's opinion that Harris is "at moderate risk for

future violence." Exhibit D-1, Dr. Mesiarik's Forensic Evaluation, at 8. Dr. Mesiarik further opined that "anger management and other skill-based training" "**may** help [Harris] better identify and avoid 'high-risk' situations, making his involvement in future aggressive or antisocial behavior **less likely**." *Id.* at 9 (emphases added). While again noting Harris "is at moderate risk for reoffending," Dr. Mesiarik found Harris' "amenability to treatment is mixed." *Id.* at 10.

This is far from the standard Harris must meet to obtain decertification. "If rehabilitation cannot be **assured** during the child's minority, the child has failed to establish that he was amenable to juvenile rehabilitation." ***Commonwealth v. Potts***, 673 A.2d 956, 958 (Pa. Super. 1996) (citation omitted, emphasis added); ***see also Commonwealth v. Reyes***, 277 A.3d 1135, 132 MDA 2021, at *8 (Pa. Super. filed April 12, 2022) (affirming trial court's denial of transfer to juvenile division where the juvenile failed to assure their rehabilitation during their minority).[2]

Considering the evidence Harris presented during the first decertification hearing, including all exhibits, Harris failed to assure his rehabilitation during his minority. This finding is highlighted by the fact that Harris is now mere months from his 21st birthday and if left to the juvenile division, this case may be resolved without any treatment before its jurisdiction ends. The trial court's

_____

[2] Pursuant to Pa.R.A.P. 126(b), we may rely on unpublished memorandum issued after May 1, 2019, for their persuasive value.

disconcerting factual finding that Harris is amenable to treatment, supervision, and rehabilitation and that it could be completed prior to Harris turning 21 years of age, is simply not supported by the record.

The other enumerated factors to be considered in determining if a child is amenable to treatment, supervision, and rehabilitation include the child's age, mental capacity, maturity, degree of criminal sophistication, previous records, nature and extent of prior delinquent history, including the success or failure of previous attempts to rehabilitate the child, any probation or institutional reports, and any other relevant factors. ***See*** 42 Pa.C.S.A. § 6355(a)(4)(iii)(G).

As discussed above, at this point it would be nearly impossible to rehabilitate Harris before he turns 21 years old in a few months' time. Harris is currently 20 years old, and his mental capacity and maturity is as expected or lower than expected according to Dr. Mesiarik's report with his intellectual functioning in the borderline range.

The degree of criminal sophistication may seem, upon initial assessment, to be relatively unsophisticated as found by the trial court. ***See*** Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 5. However, this ignores Harris shot at uniformed officers after assisting another cohort in an armed carjacking merely minutes before the officers located him in front of the recently stolen car, in another stolen car, and then fired at officers. While fleeing, Harris discarded the firearm and his jacket that contained the

keys to the second stolen car Harris was seen operating on video footage recovered after the shooting. Clearly, Harris had been working as a team with others to steal cars. All while Harris had a warrant out for violating his probation and pending firearm charges. In an attempt to elude officers, Harris also gave a fake first name and date of birth when first approached by officers who quickly surrounded the scene of the shooting. This all shows a high degree of criminal sophistication. Again, the trial court's factual findings are not supported by the record.

As noted above, the Commonwealth sought to admit evidence showing Harris' failure to successfully complete juvenile rehabilitation, but the trial court denied that request. The trial court did admit, and discuss, however, that Harris, prior to the shooting, was recently released from a juvenile detention facility and was not complying with supervision. **See** Trial Court's Findings of Fact and Conclusions of Law, 5/22/24, at 5-6. The trial court, however, did not discuss this as a failure of Harris but as a failure of the juvenile court system: "When he was released from placement, he was scheduled to participate in an evening aftercare program, but he did not attend. Nor does it appear that any effort was made to locate him to ensure his attendance." **Id.** (record citation omitted).

This finding is strikingly similar to the trial court's finding in **In re J.B.** There, this Court held the trial court erred in placing the child's rehabilitative failure on the juvenile system, rather than on the child himself: "The inability

of that system to bring about positive changes in J.B.'s behavior and function is attributed by the court, unreasonably, to the juvenile system rather than J.B.'s own failure or refusal to benefit from the system's efforts." *In re J.B.*, 909 A.2d at 399. The same can be said here. It is unreasonable to assert the system erred in failing to locate Harris, who had a warrant out for his arrest, to force him to attend a clearly unwanted aftercare program. It is Harris' own failure or refusal to attend that should be evaluated.

The trial court's finding that Harris is amenable to treatment, supervision, and rehabilitation is tenuous at best. We are constrained to find the trial court abused its discretion in granting Harris' motion for decertification. The certified record does not support the trial court's factual findings. Had Harris been amenable to treatment, he would have attended that aftercare program and would not have had a warrant out for his arrest for probation violations and firearm charges at the time of this shooting.

This Court has explained:

A transfer … to juvenile court pursuant to 42 Pa.C.S.A. § 6322 is in the "public interest" when, considering all the criteria in § 6355, the court is convinced by a preponderance of the evidence that the child is amenable to treatment, supervision, and rehabilitation as a juvenile, treatment as a juvenile is consistent with the legislature's intent to hold the child accountable for his/her offenses, and treatment as a juvenile does not jeopardize the public safety.

*Cotto*, 708 A.2d at 812.

Harris has shown he is not amenable to treatment, nor would he be held accountable for his offense of shooting at two uniformed officers 16 times and

hitting one in the head if his case were to be tried in juvenile court. Releasing Harris from juvenile jurisdiction in a few short months without extended and significant treatment would be a serious threat to public safety. We therefore find the trial court abused its discretion and failed to follow the law as required by the Juvenile Act. Harris failed to carry his burden of proving he is amenable to treatment, supervision, and rehabilitation.

Accordingly, the order of the trial court is reversed. We direct that upon remand the case remain in the adult criminal division of the Court of Common Pleas of Philadelphia County in conformity with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2025